# EXHIBIT G

instrument is a true and correct copy of the original on file in my office.
ATTEST:
DEENA C. FAWCETT, Clerk
Court of Appeal
Third Appellate District
By _____
   Deputy Clerk
Dated  05·17·06

NOT TO BE PUBLISHED

ORIGINAL

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

ATLAS DISPOSAL INDUSTRIES, LLC,

    Plaintiff and Respondent,

v.

BFI WASTE SYSTEMS OF NORTH AMERICA, INC.,

    Defendant and Appellant.

C042391

(Super. Ct. No. 00AS03373)

FILED

APR - 8 2004

COURT OF APPEAL - THIRD DISTRICT
DEENA C. FAWCETT
BY_____ Deputy

Plaintiff Atlas Disposal Industries, LLC (Atlas), operates a materials recovery facility at which mixed recyclables and waste are sorted and certain recyclable materials are recovered and sold. Defendant BFI Waste Systems of North America, Inc. (BFI), hauls residential, commercial, industrial, and construction waste and materials. BFI and Atlas entered into a Disposal Services Agreement (agreement) requiring BFI to deliver an annual minimum of 26,000 tons of source separated commingled recyclables. Dissatisfied with BFI's performance under the agreement, Atlas filed suit, alleging breach of contract, breach of the covenant of good faith and fair dealing, and fraud.

1

Following a court trial, the court found BFI breached the agreement by both failing to deliver the annual minimum tonnage and failing to deliver source separated commingled recyclables. The court awarded Atlas $316,192.50, the equivalent of $32.50 for each of the 9,729 tons not delivered. BFI appeals, contending the court erred in awarding Atlas its lost gross revenues as damages for breach of contract. We shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Facility

One person's trash is another person's treasure. In April of 1998 Atlas opened its recycling facility (facility). Henry Dwyer served as president and general manager. At the facility, Atlas sorted through its customers' waste and selected out materials to be recycled and sold. An elevated conveyor belt system passed the waste materials by workers, who sorted out recyclable materials such as wood, metal, plastic, cardboard, and paper. The nonrecyclable waste passed by as "residue." The residue was disposed of as landfill.

### The Agreement

The parties began negotiating the agreement in early 1999. After Atlas and BFI exchanged several drafts, the parties executed the agreement in March of 1999. The agreement was for a three-year term beginning on March 19, 1999. Dwyer negotiated on behalf of Atlas; Jerry Mayberry, manager of business development, negotiated on behalf of BFI.

The agreement provides, in part: "[BFI] agrees to provide commingled C&D recyclables (wood, cardboard, metals), source separated wood waste, source separated green waste, and/or other commingled recyclables (including, but not limited to, plastic, fiber, wood, ferrous and non ferrous metal) and/or other recyclable materials (any of the foregoing, 'Recyclable Materials'). Recyclable Materials shall include the type of materials generated by commercial, industrial, governmental, residential and/or institutional customers."

The agreement also contains a right of refusal on the part of Atlas: "[Atlas] shall reserve the right to reject any and all loads delivered by [BFI] which contain more than diminimus [sic] amounts of hazardous materials and/or which contain more than 10% wet waste by volume ('Contaminated Load'). In the event [Atlas] accepts a Contaminated Load, [Atlas] shall have the right to charge [BFI] an additional fee for contaminated tonnage, as outlined in Paragraph (6)(a), based on the total tonnage of contamination, provided that [Atlas] notifies [BFI] at the time of acceptance and confirms the additional fee in writing within three (3) days. Contaminated tonnage will be calculated by multiplying the percentage of contamination as measured by the load checker by the total tonnage of the Contaminated Load."

The agreement spells out the amount of recyclable materials BFI must supply: "[BFI] shall deliver to [Atlas] at [Atlas's] Facility, and [Atlas] shall receive from [BFI], 26,000 tons of Recyclable Materials (the 'Minimum Annual Quantity') and not

more than 65,000 of Recyclable Materials (the 'Maximum Annual Quantity') during each successive year beginning on the date of this Agreement ('Contract Year')."

The agreement sets the price: "[BFI] agrees to pay [Atlas] Thirty-two Dollars and Fifty Cents ($32.50) per ton for all Recyclable Materials that [BFI] delivers to [Atlas], except that rates for particular Recyclable Materials specified on Exhibit 'A', attached hereto, including clean wood waste, green waste, residential and commercial commingled recyclables, and other source separated recyclable materials are as specified on Exhibit 'A'. Additional charges for contaminated tonnage accepted by [Atlas] as specified in Exhibit 'A'."[1]

Finally, the agreement contains a "Diversion Guarantee": "Through the operation of [Atlas's] facility, [Atlas] shall divert a minimum of eighty percent (80%) of the incoming Recyclable Material delivered to the Facility by [BFI], averaged over each calendar quarter."

**The Ordinance**

At the time the agreement was negotiated, Solid Waste Authority Ordinance 2 (SWA 2) was expected to become effective on July 1, 1999. SWA 2 required waste haulers, such as BFI, to divert from landfill 30 percent of the total commercial waste they collected or be subjected to losing their hauling permits. It required facilities to divert 30 percent of the waste

---

[1] No exhibit A was ever agreed to by the parties.

accepted from haulers other than permitted haulers such as BFI. BFI's agreement with Atlas would allow BFI to meet the requirements of SWA 2.

However, during the term of the contract, this guarantee became less valuable to BFI. In June 1999 Sacramento County announced that enforcement of the 30 percent diversion requirement would be delayed until February 2000. The county later extended the delay through April 2000.

Early during the term of the contract, Allied Waste acquired BFI. Allied was building its own recycling plant, which would become operative in mid-2000. The delay in enforcement of the ordinance allowed Allied to complete construction of the recycling plant and permitted BFI to comply with the 30 percent diversion requirement of SWA 2 without delivering to Atlas.

**Varieties of Recycled Materials**

The Atlas facility was permitted to receive only "source-separated" and "commingled recyclables." Source-separated recyclables are recyclables that the hauler has separated from the nonrecyclable trash. Commingled recyclables are just what they sound like: recyclables that are commingled. Only source-separated recyclables commingled together could be accepted by the Atlas facility.

The California Code of Regulations provides the following definition of "source separated": "'Source Separated' means materials, including commingled recyclables, that have been separated or kept separate from the solid waste stream, at the

5

point of generation, for the purpose of additional sorting or processing those materials for recycling or reuse in order to return them to the economic mainstream in the form of raw material for new, reused, or reconstituted products which meet the quality standards necessary to be used in the marketplace." (Cal. Code Regs., tit. 14, § 17402.5, subd. (b)(4).)

The Integrated Waste Management Board issued a recycling facility permit to the Atlas facility. The permit did not authorize the facility to accept municipal solid waste. In addition, the permit did not allow Atlas to accept more than 10 percent wet waste by volume. Wet waste is common trash or garbage.

BFI's Mayberry was a member of the Sacramento City-County Solid Waste Advisory Committee (Committee). The Committee consists of appointed industry representatives who advise the Solid Waste Authority on meeting state mandated diversion requirements. In meetings, the Committee frequently discussed source separated commingled recyclables. Atlas's expert, James Howell, also served on the Committee. Howell testified Mayberry's service on the Committee would have exposed Mayberry to detailed testimony regarding the definition of commingled recyclables and source separation.

At trial, Mayberry testified he understood that a recycling facility could have no more than 10 percent of nonrecycled material leaving the facility. The court asked: "That's 90 percent recyclable, isn't it?" Mayberry replied: "Yes, but it's stating it differently."

## Performance Under the Agreement

The purpose of the agreement was to deliver recyclable materials to a recycling plant. Atlas intended to make a profit by charging BFI a fee for the use of the facility and by selling the recycled materials. BFI sought the 30 percent diversion guarantee mandated by the ordinance.

At the beginning of the agreement, BFI planned on supplying open top "roll off" boxes. Roll off boxes are primarily from new construction and contain a multiplicity of recyclables. However, BFI found it did not have sufficient construction and demolition loads to meet the agreement's minimum requirements. To increase deliveries, BFI added more trash loads.

Atlas complained that BFI delivered materials with more than 10 percent nonrecycled materials in violation of the agreement's provisions. Atlas also repeatedly informed BFI that it was failing to make the minimum deliveries of source separated recyclable materials. Contaminated loads take longer to process at a greater cost.

In response, Mayberry informed Atlas that BFI's drivers needed better education as to acceptable materials. Atlas had education courses for BFI drivers. Atlas also established a procedure for advising BFI of contaminated loads so that BFI could make changes with customers.

Atlas employee Christopher Bungay testified regarding his job checking loads as they were received at the facility. Bungay ascertained whether the loads were appropriate for

recycling. Atlas also employed "spotters," who checked incoming trucks for contaminated loads. Bungay supervised the spotters.

BFI delivered two types of truckloads to the Atlas facility: roll-off loads and front loads. A spotter checked roll-off loads by climbing on top and looking into the container to estimate the contamination level. Front load trucks are impossible to inspect for nonrecyclables because the load is compacted and only a small portion is visible. When the door opens, the material falls out, forcing Atlas to accept the material regardless of its makeup. Only BFI brought front load trucks to the facility.

Bungay estimated BFI's roll-off loads met the agreement's requirements only 30 to 40 percent of the time, failed to meet the standard 40 to 60 percent of the time, and contained approximately 60 to 70 percent recyclable materials. In a contract year, BFI loads contained about 50 percent recyclable materials. Atlas accepted marginal loads, loads that did not contain at least 80 percent recyclable material, from BFI.

**The Complaint and the Trial Court's Decision**

Atlas filed a complaint, alleging breach of contract, breach of the covenant of good faith and fair dealing, and fraud. The court issued a tentative statement of decision finding in favor of Atlas and awarding damages. BFI requested a statement of decision, and both parties submitted proposals as to the content of the statement of decision. Subsequently, the court adopted the tentative statement of decision.

8

In its statement, the court summarized the agreement between the parties. The court found that Atlas's negotiator, Dwyer, and BFI's negotiator, Mayberry, were both highly experienced in the industry. The agreement required BFI to deliver a minimum of 26,000 tons of "'source separated and commingled recyclables'" during each year of the contract. In return, BFI received an 80 percent diversion credit from Atlas to meet the requirements of SWA 2. The court also discussed the reasons the diversion guarantee became less important to BFI during the term of the agreement.

The court recounted BFI's efforts to meet the agreement's delivery requirements. The court found that, on average, BFI loads delivered to Atlas contained only 50 percent recyclable materials. Atlas continually complained to BFI about the excessive contamination of BFI loads. The court found BFI breached the agreement by failing to deliver source separated commingled recyclables. Instead, BFI delivered recyclables commingled with more than 10 percent trash.

The court, in determining damages for BFI's breach of the agreement, cited Civil Code section 3300.[2] The court noted the basic object of damages is compensation: "The aim is to put the injured party in as good a position as he would have been had performance been rendered as promised."

---

[2] All further statutory references are to the Civil Code unless otherwise indicated.

9

The court discussed the "tip fee shortfall" claimed by Atlas: "[Atlas] claims $316,192.50 based on the rate of 9729 tons at $32.50 per ton. [Atlas] produced records and the testimony of its expert James Howell to establish this amount. Mr. Howell testified that his opinion as to the tonnage amount was based largely on the certified public weigh master records at Atlas Disposal. [BFI] argued, but failed to produce concrete evidence to show that the calculation of the amount of tons actually received is erroneous."

The court also rejected BFI's argument that the shortfall amount should be reduced by the number of tons wrongfully rejected by Atlas. The court found BFI failed to meet its burden of producing sufficient evidence from which the court could calculate the number of tons for an offset. According to the court: "[BFI's] employees' testimony regarding the quality and the number of loads rejected is anecdotal and based on assumptions that lack any proper foundation. The testimony is insufficient to controvert [Atlas's] evidence that it rejected the loads because they contained unacceptable amounts of non-recyclable materials. Moreover, even assuming that some of the loads were wrongfully rejected, [BFI] has not shown that this was the cause of its inability to meet its minimum commitment. [BFI] has failed to show that it is entitled to any offset."

After ascertaining the evidence supported a price of $32.50 per ton, the court concluded: "The evidence shows that [BFI] was trying to meet its commitment by delivering commingled commercial loads. It is reasonable to infer from the

10

circumstances that the 9729 missing tons would have been delivered in the same manner. The only agreed fee that is reasonably applicable to such loads is $32.50. Based on the shortfall amount of 9729 tons at the rate of $32.50 a ton, [Atlas] is entitled to the principal amount of $316,192.50 for the tip fee shortfall."

The court also considered Atlas's claim for lost profits based on commodity revenue shortfall; excess disposal costs; and lost commodity revenue on BFI excess disposal tonnage. The court noted: "Essentially, the three areas identified are elements of the profits [Atlas] expected to make from the contract." The court discussed each claim and found insufficient evidence to support any award of lost profits. In part, the court based its decision on the fact that Atlas was a young company without a track record of profits or losses, rendering the calculation of lost profits too speculative to meet the standard of reasonable certainty. Finally, the court denied Atlas's claim for punitive damages.

The trial court entered judgment in favor of Atlas. BFI filed a timely notice of appeal.

## DISCUSSION

### I

The parties vociferously disagree over the appropriate standard of review. BFI contends the question of whether a trial court applied an incorrect or incomplete measure of damages is one of law, which we review de novo. Atlas agrees the determination of the proper measure of damages presents a

11

question of law. However, Atlas also contends the application of the appropriate damage standard to the facts is essentially a factual determination governed by the substantial evidence standard.

BFI attempts to couch its appeal as challenging the measure of damages employed by the court in making its award. However, BFI is actually challenging the court's *calculation* of Atlas's damages, arguing the court erred in not factoring into the award Atlas's costs of processing the recyclables. BFI essentially contends the court erred in not offsetting the costs of processing the recyclables.

The amount of damages is a fact question, committed to the discretion of the trier of fact. All presumptions favor the trial court's ruling, which is entitled to great deference because the trial judge, having been present at trial, necessarily is more familiar with the evidence and is bound by the more demanding test of weighing conflicting evidence rather than the standard of appellate review under the substantial evidence test. We must uphold an award of damages whenever possible. (*Westphal v. Wal-Mart Stores, Inc.* (1998) 68 Cal.App.4th 1071, 1078 (*Westphal*).)

In addition, our power to review the trier of fact's determination of damages is severely circumscribed. We may interfere with that determination only where the sum awarded is so disproportionate to the evidence as to suggest that the verdict was the result of passion, prejudice, or corruption, or where the award is so out of proportion to the evidence that it

shocks the conscience. (*Johnson v. Stanhiser* (1999) 72 Cal.App.4th 357, 361.)

## II

The basic object of damages is compensation, and in contract law, the theory is that the party injured by a breach should receive as nearly as possible the equivalent of the benefits of performance. The law aims to put the injured party in as good a position as he or she would have been in had performance been rendered as promised. (*Auerbach v. Great Western Bank* (1999) 74 Cal.App.4th 1172, 1191.) However, contract damages that are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery. (*Scott v. Pacific Gas & Electric Co.* (1995) 11 Cal.4th 454, 473.)

## III

In determining the damages due Atlas, the trial court cited section 3300. Section 3300 provides: "For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom."

The court applied section 3300 and determined BFI failed to deliver 9,729 tons, for which BFI would have paid Atlas $32.50 per ton for a total of $316,192.50. This, the court found, put Atlas in as good a position as it would have been in had BFI delivered the tonnage as required by the agreement.

However, BFI accuses the trial court of ignoring an important corollary to section 3300: section 3358. Section 3358 states: "Except as expressly provided by statute, no person can recover a greater amount in damages for the breach of an obligation, than he could have gained by the full performance thereof on both sides."

In a nutshell, BFI argues: "Unquestionably, the $316,192 represents the sum that BFI would have paid Atlas to receive and process 9,729 tons of waste, and does not account for the costs that Atlas would have incurred to process these loads at its [materials recovery facility] -- as the company was contractually obligated to do under the [agreement] to fulfill its 80% diversion guarantee to BFI.  Because Atlas' processing costs are not included in this measure of damages, the court's award improperly puts Atlas in a better position than the company would have been in had the parties fully performed the contract.  The Court's failure to subtract Atlas' processing costs from the gross revenues was an error. *See*, Civil Code § 3358." BFI characterizes the court's award as an award of "gross revenues" as opposed to a proper award of "lost profits."

On a superficial level, BFI's argument seems sound and persuasive.  However, BFI overlooks an important aspect of the agreement between the parties.  As the court noted, Atlas intended to make a profit by charging BFI a fee for the use of its facility, the $32.50 per ton tipping fee, *and* by selling the recovered recycling materials.  To recover the recyclables,

14

Atlas would incur certain processing costs, the costs BFI seeks to offset against the tipping fee damages awarded by the court.

The costs of recovery comprise only half of the equation. After recovering the recyclables, Atlas sought to sell them for a profit. Atlas sought these lost profits at trial. After considering the evidence presented at trial, the court concluded: "There is insufficient evidence to support a finding that [Atlas] suffered actual or potential loss of profits because of any shortfall in commodity revenue during the first year of the contract."

BFI seeks to deduct the costs of recovering the recyclables from the damages awarded by the trial court. BFI argues: "Here, under Section 3358, the trial court was required to (1) determine what it would have cost Atlas to fully perform the contract by processing the missing 9,729 tons and disposing of the residue, and (2) subtract that cost from the $316,192.50 in lost gross revenue that BFI would have paid Atlas as tip fees to receive and process the 9,729 tons. Only after subtracting Atlas' processing and disposal costs from the gross revenues could the trial court determine Atlas' damages from the shortfall. This would have been Atlas' lost profits from the shortfall and was the proper measure of damages in this case."

BFI places the burden of ascertaining the offset it seeks against Atlas squarely on the trial court. However, the burden is elsewhere: the party who seeks to establish a claim or defense has the burden of proof on that fact. (Evid. Code,

§ 500; *Kellogg v. Asbestos Corp. Ltd.* (1996) 41 Cal.App.4th 1397, 1408.)

Here, the trial court specifically found BFI failed to meet its burden of producing sufficient evidence from which the court could calculate the number of tons for an offset. The court termed the proffered evidence "anecdotal" and "based on assumptions that lack any proper foundation." The newness of Atlas's facility and the contaminated loads delivered by BFI made lost profits too speculative to calculate. The calculation of expenses, a factor in determining profits, was also difficult. BFI made no effort to prove the amount of any offset and now complains that the trial court erred in failing to deduct the unproven amount.

Generally, the amount and existence of damages is a factual question committed to the discretion of the trial court. On appeal, all presumptions favor the trial court's ruling, which is entitled to great deference. The trial court necessarily is more familiar with the evidence and is bound by the more demanding test of weighing conflicting evidence. (*Westphal, supra,* 68 Cal.App.4th at p. 1078.)

While section 3301 provides that no damages can be recovered for a breach of contract that are not clearly ascertainable in both nature and origin, the fact that the amount of damage may not be susceptible of exact proof or may be uncertain, contingent, or difficult to ascertain does not bar recovery. Where a defendant, by willful breach of contract, has given rise to the difficulty of proving the amount of a claimed

loss of profits, it is proper to require only that the plaintiff show the amount of damages with reasonable certainty and to resolve uncertainties against the defendant. (*Aronowicz v. Nalley's, Inc.* (1972) 30 Cal.App.3d 27, 53.)

Here, the court, after considering all the evidence before it, awarded Atlas the tipping fee it would have received had BFI performed under the agreement. Faced with a lack of evidence as to both the revenues Atlas would have generated on the sale of recyclable commodities and the expenses incurred in producing that revenue, the court declined to award lost profits. The same evidentiary vacuum that deprived the court of a basis for awarding lost profits also renders untenable BFI's claim for an offset. Given the evidence, we find the court's award appropriate under the circumstances of this case.

## DISPOSITION

The judgment is affirmed. Atlas shall recover costs on appeal.

_____, J.

We concur:

_____, Acting P.J.

_____, J.